

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-10-1997

# Yeskey v. PA Dept Corrections

Precedential or Non-Precedential:

Docket 96-7292

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Yeskey v. PA Dept Corrections" (1997). *1997 Decisions*. Paper 155.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/155

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 10, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 96-7292

RONALD R. YESKEY,
<u>APPELLANT</u>

v.

COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF
CORRECTIONS; JOSEPH D. LEHMAN; JEFFREY A.
BEARD, PH.D.; JEFFREY K. DITTY; DOES NUMBER 1
THROUGH 20, INCLUSIVE,

<u>APPELLEES</u>

On Appeal From the United States District Court
For the Middle District of Pennsylvania
(D.C. Civ. No. 95-cv-02125)

Argued: January 31, 1997

Before: BECKER, ROTH, <u>Circuit Judges</u>, and
BARRY, <u>District Judge</u>.*

(Filed July 10, 1997)

L. ABRAHAM SMITH, ESQUIRE
 (ARGUED)
P.O. Box 1644
Greensburg, PA 15601

<u>Attorney for Appellant</u>

_____

*Honorable Maryanne Trump Barry, United States District Judge for
the District of New Jersey, sitting by designation.

THOMAS W. CORBETT, JR.
Attorney General
R. DOUGLAS SHERMAN (ARGUED)
Deputy Attorney General
CALVIN R. KOONS
Senior Deputy Attorney General
JOHN G. KNORR, III
Chief Deputy Attorney General

Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120

<u>Attorneys for Appellees</u>

**OPINION OF THE COURT**

BECKER, <u>Circuit Judge</u>.

Ronald R. Yeskey is a Pennsylvania prison inmate who was denied admission to the Pennsylvania Department of Correction's Motivational Boot Camp program because of a history of hypertension, despite the recommendation of the sentencing judge that he be placed therein.[1] Yeskey brought suit in the district court under the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101 <u>et seq.</u>, alleging that his exclusion from the program violated that enactment.[2]

The district court dismissed Yeskey's complaint, Fed. R.

_____

1. The Motivational Boot Camp Act, 61 P.S. §1121 <u>et seq.</u>, established a "motivational boot camp" to which certain inmates may be assigned by the Department of Corrections to serve their sentences for a period of six months. The boot camp provides rigorous physical activity, intensive regimentation and discipline, work on public projects, and other treatment. <u>Id.</u> §1123. Pursuant to statute, placement of inmates in the boot camp is discretionary, and, as such, no inmate has a right to such placement. <u>Id.</u> §1126(d). Upon successful completion of the six months incarceration, the inmate is released on parole for intensive supervision as determined by the Pennsylvania Board of Probation and Parole. <u>Id.</u> §1127.

2. Yeskey also asserted claims under 42 U.S.C. § 1983 and state law.

2

Civ. P. 12(b)(6), holding that the ADA is inapplicable to state prisons. The question of the applicability of the ADA to prisons is an important one, especially in view of the increased number of inmates, including many older, hearing-impaired, and HIV-positive inmates, in the nation's jails. See generally Ira P. Robbins, George Bush's America Meets Dante's Inferno: The Americans with Disabilities Act in Prison, 15 Yale L. & Pol'y Rev. 49, 56-63 (1996). For the reasons that follow, we reverse.3

I.

Because this appeal turns on statutory construction, we begin with the text of the relevant statute, or more precisely, statutes. Although Yeskey only invoked the ADA, our discussion necessarily involves Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a). Section 504, the first federal statute to provide broad prohibitions against discrimination on the basis of disability, applies only to programs and activities receiving federal financial assistance. Title II of the ADA, the broader statute, enacted in 1990, extends these protections and prohibitions to all state and local government programs and activities, regardless of whether they receive federal financial assistance. Congress has directed that Title II of the ADA be interpreted in a manner consistent with Section 504, 42 U.S.C. § 12134(b), 12201(a),4 and all the leading cases take up the statutes together, as will we.

The substantive provisions of the statutes are similar. Section 504 provides in pertinent part:

_____

3. By the time this case was listed for submission in this Court, only a short time remained on Yeskey's sentence, and we have unfortunately been unable to dispose of it until now. He may have been released (the parties have not informed us on this point). However, Yeskey's complaint included a claim for damages, and hence the case is not moot. We also note that, since boot camp placement commences contemporaneous with the execution of sentence, it would probably be nigh impossible to test improper exclusion from the boot camp program in federal court before the six month placement expires, likely creating a situation capable of repetition yet evading review, which excuses mootness.

4. See generally Robbins, supra, at 73-76.

3

No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency[.]

29 U.S.C. § 794(a).

Title II of the ADA provides in pertinent part:

no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the Services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

The statutory definition of "[p]rogram or activity" in Section 504 indicates that the terms were intended to be all-encompassing. They include "all of the operations of -- (1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government . . . any part of which is extended Federal financial assistance." 29 U.S.C. §794(b) (emphasis added). It is hard to imagine how state correctional programs would not fall within this broad definition.

Moreover, a word in a statute "must be given its `ordinary or natural' meaning," see Bailey v. United States, 116 S. Ct. 501, 506 (1995), and the ordinary meanings of "activity" and "program" clearly encompass those that take place in prisons. "Activity" means, inter alia, "natural or normal function or operation," and includes the "duties or function" of "an organizational unit for performing a specific function." Webster's Third New International Dictionary 22 (1986). "Program" is defined as "a plan of procedure: a schedule or system under which action may be taken toward a desired goal." Id. at 1812. Certainly, operating a prison facility falls within the "duties or functions" of local government authorities. Moreover, Title II's definition of a "public entity" clearly encompasses a state or local correctional facility or authority: "any department, agency,

4

. . . or other instrumentality of a State or States or local government[.]" 42 U.S.C. § 12131(1)(B) (emphasis added).

This conclusion is bolstered by the Department of Justice (DOJ) regulations implementing both Section 504 and Title II of the ADA. These regulations were expressly authorized by Congress, 29 U.S.C. § 794(a); 42 U.S.C. §§ 12134(a), 12206, and, in view of Congress' delegation, the DOJ's regulations should be accorded "controlling weight unless [they are] `arbitrary, capricious, or manifestly contrary to the statute,' " Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 115 S. Ct. 2407, 2418 (1995). The same is true of the preamble or commentary accompanying the regulations since both are part of the DOJ's official interpretation of the legislation. Thomas Jefferson Univ. v. Shalala, 114 S. Ct. 2381, 2386 (1994). DOJ interprets both Section 504 and Title II of the ADA to apply to correctional facilities.

The regulations promulgated by DOJ to enforce Section 504 define the kinds of programs and benefits that should be afforded to individuals with disabilities on a nondiscriminatory basis. The regulations define "program" to mean "the operations of the agency or organizational unit of government receiving or substantially benefiting from the Federal assistance awarded, e.g., a police department or department of corrections." 28 C.F.R. § 42.540(h) (1996) (emphasis added). The term "[b]enefit" includes "provision of services, financial aid or disposition (i.e., treatment, handling, decision, sentencing, confinement, or other prescription of conduct)." Id. § 42.540(j) (emphasis added). The appendix to the regulations, attached to the Final Rule (45 Fed. Reg. 37620, 37630 (1980)), makes clear that services and programs provided by detention and correctional agencies and facilities are covered by Section 504. This coverage is broad, and includes "jails, prisons, reformatories and training schools, work camps, reception and diagnostic centers, pre-release and work release facilities, and community-based facilities." Id.

The appendix further provides that those facilities designated for use by persons with disabilities are "required to make structural modifications to accommodate detainees or prisoners in wheelchairs." Id. The DOJ regulations

5

applicable to federally conducted programs also make it clear that institutions administered by the Federal Bureau of Prisons are subject to Section 504. See 28 C.F.R. § 39.170(d)(1)(ii) (Section 504 complaint procedure for inmates of federal penal institutions); id. pt. 39, Editorial Note, at 675 (Section 504 regulations requiring nondiscrimination in programs or activities of the Department of Justice apply to the Federal Bureau of Prisons); id. at 676 (federally conducted program is "anything a Federal agency does").

The regulations promulgated under Title II of the ADA afford similar protections to persons with disabilities who are incarcerated in prisons, or otherwise institutionalized by the state or its instrumentalities, regardless of the public institution's receipt of federal financial assistance. The regulations state that the statute's coverage extends to "all services, programs, and activities provided or made available by public entities." Id. § 35.102(a). This broad language is intended to "appl[y] to anything a public entity does." Id. pt. 35, app. A, subpt. A at 456. As part of its regulatory obligations under Title II, the DOJ is designated as the agency responsible for coordinating the compliance activities of public entities that administer "[a]ll programs, services, and regulatory activities relating to law enforcement, public safety, and the administration of justice, including courts and correctional institutions." Id. § 35.190(b)(6). The preamble to the ADA regulations also refers explicitly to prisons, stating that, where an individual with disabilities "is an inmate of a custodial or correctional institution," the entity is required to provide "assistance in toileting, eating, or dressing to [that] individual[ ]." Id. pt. 35, app. A at 468.5

_____

5. Moreover, the DOJ Title II Technical Assistance Manual specifically lists "jails and prisons" as types of facilities that, if constructed or altered after the effective date of the ADA (January 26, 1992), must be designed and constructed so that they are readily accessible to and usable by individuals with disabilities. Title II Technical Assistance Manual II-6.0000, II-6.3300(6). The design standards applicable to facilities covered by Section 504 and Title II also include specific provisions relating to correctional facilities. The DOJ Section 504 regulations adopt the Uniform Federal Accessibility Standards (UFAS),

6

In sum, Section 504 of the Rehabilitation Act, Title II of the ADA, and the specific provisions in the DOJ's regulations listing correctional facilities or departments as covered entities confirm that the Rehabilitation Act and the ADA apply to state and locally-operated correctional facilities.

## II.

The weight of judicial authority also supports our conclusion that the ADA applies to prison programs. In Crawford v. Indiana Department of Corrections, ___ F.3d ___, 1997 WL 289101 (7th Cir. June 2, 1997), the Seventh Circuit held that Title II of the ADA applied to state prisons in the case of a blind, former state prisoner who sought damages resulting from his exclusion from a variety of programs, activities, and facilities at the prison that were routinely available to the prison's population, including educational programs, the library, and the dining hall. Accord Duffy v. Riveland, 98 F.3d 447, 455 (9th Cir. 1996); Harris v. Thigpen, 941 F.2d 1495, 1522 n.41 (11th Cir. 1991) (holding Rehabilitation Act applicable).

Two circuits have questioned the applicability of Section 704 and Title II to prisons. See Torcasio v. Murray, 57 F.3d 1340, 1344-46 (4th Cir. 1995) (coverage of prisons by Section 504 and Title II not clearly established in qualified immunity context), cert. denied, 116 S. Ct. 772 (1996);

---

which apply to federal agencies and entities receiving federal financial assistance. 28 C.F.R. § 42.522(b). UFAS lists "jails, prisons, reformatories" and "[o]ther detention or correctional facilities" as institutions to which the accessibility standards apply. 41 C.F.R. subpt. 101-19.6, app. A at 150. Under Title II, covered entities building new or altering existing facilities may follow either UFAS or the ADA Accessibility Guidelines for Buildings and Facilities (ADAAG). 28 C.F.R. § 35.151(c); see id. pt. 36, app. A. Amendments to the ADAAG, adopted as an Interim Final Rule, effective December 20, 1994, by the Architectural & Transportation Barriers Compliance Board, include specific accessibility guidelines for "detention and correctional facilities." 59 Fed. Reg. 31676, 31770-72 (1994). The Department of Justice has proposed adoption of the interim final rule. Id. at 31808. The ADAAG is not effective until adopted by the DOJ.

White v. State of Colorado, 82 F.3d 364, 367 (10th Cir. 1996) (neither ADA nor Rehabilitation Act applies to prison employment). In our view, these opinions are seriously flawed. The leading case in support of the Commonwealth's position is Torcasio, which was followed by the district court here, and so we focus our sights on that case.6

The Fourth Circuit in Torcasio acknowledged that the broad language prohibiting discrimination on the basis of disability in both statutes "appears all-encompassing," 57 F.3d at 1344. Nevertheless, the Torcasio court was reluctant to find either statute applicable to prisons because of the so-called "clear statement" doctrine, as set out in Will v. Michigan Department of State Police, 491 U.S. 58, 65 (1989):

if Congress intends to alter the "usual constitutional balance between the States and the Federal Government," it must make its intention to do so "unmistakably clear in the language of the statute." Atascadero State Hospital v. Scanlon, 473 U.S. 234, 242 . . . (1985); see also, Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 99 . . . (1984).

Because it found the operation of prisons to be a "core state function," 57 F.3d at 1345, and because neither Section 504 nor Title II includes an express statement of its application to correctional facilities, the Torcasio court expressed its doubt that Congress had "clearly" intended either statute to apply to state prisons. Id. at 1346.

This extension of the clear statement rule was unwarranted. Will, Atascadero, and Pennhurst all involved instances in which there had been no express waiver or abrogation of the state's traditional immunity from suit, either by the state itself (Pennhurst), or by Congress (Will, Atascadero). Here, in contrast, both Section 504 and Title

_____

6. Torcasio did not decide whether either Section 504 or Title II of the ADA applies to prisons; rather, it concluded that such coverage was not clearly established at the time of the events at issue, and that the individual defendants in that case therefore were entitled to qualified immunity. In reaching its qualified immunity ruling, however, the Torcasio court discussed the reach of the two statutes at length, and expressed its doubt that either applied to prisons.

8

II of the ADA contain an "unequivocal expression of congressional intent to overturn the constitutionally guaranteed immunity of the several states." Pennhurst, 465 U.S. at 99 (internal quotation marks and citation omitted); see 42 U.S.C. § 2000d-7(a)(1) ("A State shall not be immune under the Eleventh Amendment . . . from suit in Federal court for a violation of section 504 of the Rehabilitation Act."); id. § 12202 ("A State shall not be immune under the eleventh amendment . . . from an action in Federal or State court of competent jurisdiction for a violation of[the ADA].").

To be sure, when "Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." Gregory v. Ashcroft, 501 U.S. 452, 460, 461 (1991) (internal quotation marks and citations omitted). This requirement, however, is a "rule of statutory construction to be applied where statutory intent is ambiguous." Id. at 470. It is not a warrant to disregard clearly expressed congressional intent.

Torcasio's statement that Congress must specifically identify state or local prisons in the statutory text, if it wishes to regulate them, was expressly disavowed by the Supreme Court in Gregory. See id. at 467 ("This does not mean that the Act must mention judges explicitly."). Congress need only make the scope of a statute "plain." Id. And Congress has done that here. Both Section 504 and Title II speak unambiguously of their application to state and local governments and to "any" or "all" of their operations. In light of the clear and all-encompassing language of both statutes, there is no basis for requiring Congress to have detailed which of the many important components of state and local governments were to be included in the terms "any" and "all."

In Crawford, supra, just as in this case, the state relied on the fact that prison administration was a "core" state function in arguing that the clear statement rule was triggered. Judge Posner responded most forcefully:

Prison administration is indeed a core function of state government, as is education. But the state's concession

9

that the Americans with Disabilities Act applies to the prison's relations with its employees and visitors, as well as to the public schools, suggests that the clear-statement rule does not carry this particular core function of state government outside the scope of the Act. We doubt, moreover, that Congress could speak much more clearly than it did when it made the Act expressly applicable to all public entities and defined the term "public entity" to include every possible agency of state or local government. Maybe there is an inner core of sovereign functions, such as the balance of power between governor and state legislature, that if somehow imperiled by the ADA would be protected by the clear-statement rule, cf. Gregory v. Ashcroft, supra, 501 U.S. at 461-63; but the mere provision of public services, such as schools and prisons, is not within that inner core.

Crawford, ___ F.3d ___, 1997 WL 289101, at *4. We agree.

III.

Despite the Commonwealth's contention to the contrary, moreover, prisoners (in contrast to prisons) are not excluded from coverage because Section 504 and Title II protect only "qualified individual[s] with a disability." That term is defined in Title II to mean:

an individual with a disability who, with or without reasonable modifications . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). The terms "eligibility" and "participation" do not, as Torcasio stated, see 57 F.3d at 1347, "imply voluntariness" or mandate that an individual seek out or request a service to be covered. To the contrary, the term "eligibility" simply describes those who are "fitted or qualified to be chosen," without regard to their own wishes. See Webster's Third New International Dictionary, supra at 736.

Judge Posner addressed a related aspect of the case quite incisively:

10

It might seem absurd to apply the Americans with Disabilities Act to prisoners. Prisoners are not a favored group in society; the propensity of some of them to sue at the drop of a hat is well known; prison systems are strapped for funds; the practical effect of granting disabled prisoners rights of access that might require costly modifications of prison facilities might be the curtailment of educational, recreational, and rehabilitative programs for prisoners, in which event everyone might be worse off. But . . . there is another side to the issue. The Americans with Disabilities Act was cast in terms not of subsidizing an interest group but of eliminating a form of discrimination that Congress considered unfair and even odious. The Act assimilates the disabled to groups that by reason of sex, age, race, religion, nationality, or ethnic origin are believed to be victims of discrimination. Rights against discrimination are among the few rights that prisoners do not park at the prison gates. Although the special conditions of the prison setting license a degree of discrimination that would not be tolerated in a free environment, there is no general right of prison officials to discriminate against prisoners on grounds of race, sex, religion, and so forth. If a prison may not exclude blacks from the prison dining hall and force them to eat in their cells, and if Congress thinks that discriminating against a blind person is like discriminating against a black person, it is not obvious that the prison may exclude the blind person from the dining hall, unless allowing him to use the dining hall would place an undue burden on prison management.

Crawford, __ F.3d __, 1997 WL 289101, at *5 (citations omitted). We agree here as well.

In sum, in enacting the ADA, Congress "invoke[d] the sweep of [its] authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. § 12101(b)(4). The "critical areas" in which "discrimination against individuals with disabilities persists" were set forth in the statute, and include "institutionalization." Id. § 12101(a)(3).

11

Thus, if the plain words of a statute are to guide the courts in interpreting it, then both statutes must be held to apply to state and local correctional facilities.7 Essentially, the Commonwealth is asking us to amend the statute, something we cannot do.

IV.

The foregoing discussion establishes that the ADA applies to Yeskey's claim. His claim for injunctive relief is, apparently, moot in view of the impending (or actual) completion of his prison term. His claim for damages will turn, presumably, on whether he should (or would) have been admitted to the boot camp. Even with the ADA applicable, Yeskey might not have been admitted for a number of reasons, which will have to be explored on remand.

The Commonwealth has invoked the specter of federal court management of state prisons:

 Application of the ADA to internal prison management would place nearly every aspect of prison management into the court's hands for scrutiny simply because an inmate has a disability. See Pierce v. King, 918 F. Supp. 932, 941 (E.D.N.C. 1996). For instance, if the ADA applies to routine prison decisions, it is not unfathomable that courts will be used to reconstruct cells and prison space, to alter scheduling of inmate movements and assignments and to interfere with security procedures.

Brief at 15. Although these considerations do not override our conclusion that the ADA applies to prisons, our holding does not dispose of the controversial and difficult question whether principles of deference to the decisions of prison officials in the context of constitutional law apply to

_____

7. We add that the legislative history does not inveigh against this conclusion. When the ADA was enacted in 1990, the Rehabilitation Act had been law for seventeen years and a number of cases had held it applicable to prisons and prisoners, yet Congress did not amend that Act or alter any language so as to extirpate those interpretations.

12

statutory rights. See generally Robbins, supra, at 94-97.8
We are not sure of the answer, and need not address that
question now for, at all events, we doubt that it will be
germane in this case. We do, however, "flag" it for another
day.

The judgment of the district court will be reversed, and
the case remanded for further proceedings consistent with
this opinion.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

_____

8. Turner v. Safley, 482 U.S. 78 (1987), establishes a four-part
"reasonableness" test for judicial deference to prison managment
decisions in the face of constitutional challenges (usually under the
Eighth Amendment). The first requirement is "a valid rational
connection" between the regulation and the alleged governmental
interest. The second inquiry is whether alternative means exist for
inmates to exercise the right under consideration. The third issue is the
effect that accommodation of the asserted right will have on security,
administrative efficiency, prison staff, and the larger inmate population.
The final prong of the test is whether an alternative means exists for
prison officials to accomplish their objectives without infringing on
inmates' rights. See also O'Lone v. Estate of Shabazz, 482 U.S. 342
(1987) (reaffirmed the Turner standard with respect to alleged
infringement of inmates' First Amendment right to free exercise of
religion).

The Ninth Circuit has held that the Turner standard applies to
statutory rights such as those created by the ADA. In Gates v. Rowland,
39 F.3d 1439 (9th Cir. 1994), the court reversed a lower court's ruling
that denial of food-service positions to HIV-positive inmates
discriminated against them impermissibly. Reasoning that, where
constitutional protections bend, statutory privileges must too, the court
deferred to the penalogical concerns asserted by prison officials. The
Eighth Circuit disagrees. See Pargo v. Elliott , 49 F.3d 1355 (8th Cir.
1995)(Turner does not foreclose all heightened judicial review.)

13