**Hugh CALLAWAY**

v.

**SMITH COUNTY, et al.**

**No. Civ.A. 6:97CV834.**

United States District Court,
E.D. Texas,
Tyler Division.

Jan. 21, 1998.

Hugh Burns Callaway, Tyler, TX, pro se.

Michael Tracy Crawford, Ramey & Flock, Tyler, TX, for defendant.

## MEMORANDUM OPINION AND ORDER OF DISMISSAL

GUTHRIE, United States Magistrate Judge.

The Plaintiff Hugh Callaway, a former inmate of the Smith County Jail proceeding pro se, filed this civil action under 42 U.S.C. § 1983 complaining of alleged violations of his civil rights. The lawsuit was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrates.

An evidentiary hearing was conducted on November 20, 1997, pursuant to *Spears v. McCotter*, 766 F.2d 179 (5th Cir.1985). At this hearing, the parties consented to allow the undersigned United States Magistrate Judge to enter final judgment in this proceeding. 28 U.S.C. § 636(c).

### The Testimony at the Hearing

#### A. Hugh Callaway

Callaway testified that he was confined in the Smith County Jail from June 5 until August 12, 1997. He said that he suffered from Acquired Immune Deficiency Syndrome, commonly known as "AIDS." When he entered the Smith County Jail, he was on a medication known as the "new cocktail," which included AZT and Crixivan, a protease inhibitor. Callaway testified that he informed the jailers of his medical needs when he was booked into the jail.

However, Callaway said, the jailers wrote down the wrong dosage for Crixivan, saying he should take 400 mg when in fact he should take 800 mg. For the first five days he was in the jail, he received no Crixivan at all, and then got 400 mg doses for the next 15 days. Callaway stated that giving too little Crixivan is dangerous because the virus can build up a resistance. He conceded that he received AZT and another medication, which he identified as "3TC," during this time. Although Callaway asked that the jail medical staff call Dr. Shallin, his regular doctor at East Texas Medical Center, they did not do so.

Nineteen days after entering the jail, Callaway said, he saw a physician, Dr. Stockton, for the first time. He conceded that prior to seeing Dr. Stockton, he had been seeing the jail nursing staff. Callaway said that the first thing that Dr. Stockton said to him was "you want your Crixivan increased," and he ordered that this be done. Callaway further said that he did not see Dr. Perkins, the head doctor over the jail, until he had been in confinement for 56 days.

When he first entered the jail, Callaway said, he was placed in a side cell, which he characterized as "solitary confinement." This cell was dirty because it had bread crumbs and bits of food on the floor, left by a previous occupant. Callaway said that he stayed in this cell for a week. In reviewing the jail records, Callaway said, he noted that someone had marked "universal precautions" by his name, but the logs were not signed.

When he finally left the side cell, Callaway said, he was placed in a tank which was locked down. Callaway stated that this tank, known as "3–J," housed violent offenders and inmates with mental problems. In the lockdown tank, Callaway said that the inmates were confined to their cells for 23 1/2 hours a day, and only released to shower or use the telephone. However, he conceded that he was not denied any privileges such as visitation or recreation.

Callaway complained that he was placed in lockdown because of discrimination against his medical condition. He said that while in lockdown, he was denied the privilege of going to the tank dayroom, which was given to other inmates not on lockdown.

Next, Callaway said, he wanted a high-protein, high-calorie diet for his medical condition, but could not get one. On July 31, 1997, Dr. Perkins ordered that Callaway receive double portions of food when possible, but Callaway said that he only received double portions three times.

Callaway stated that when he entered the jail, his viral load[1] was "undetectable," but that it increased to a measurable level when he left the jail. Callaway conceded that at the time of the hearing, his viral load was again undetectable. Callaway also stated that as a result of not getting a high-protein, high-calorie diet, he "felt weak" during his stay in the jail.

The only named Defendants in the lawsuit are Smith County, Sheriff J.B. Smith, and the University of Texas Health Center at Tyler. Callaway explained that the jail had a policy of confining AIDS patients in lockup, and so he believes that the county and the sheriff are liable for this policy. He further said that the medical care at the jail is provided by UTHC, which also employs Dr. Perkins and Dr. Stockton, and so that entity should be responsible for the medical care which he received.

On cross-examination, Callaway conceded that he went to the jail clinic "a number of times," even before he first saw Dr. Stockton. He complained that he was given medication by the doctors even before they examined him, and that Dr. Perkins should have seen him before 56 days had elapsed.

Callaway also conceded that although he complained about his placement in a tank holding "the worst inmates in the jail," he himself had spent several years in the state penitentiary on a robbery charge.

Callaway conceded that one of the intake forms said that he was taking 400 mg of Crixivan, but said that he had not written the amount and that it must have been "a mistake."

*B. Jail Administrator Gary Pinkerton*

Captain Gary Pinkerton, the jail administrator at the Smith County Jail, testified that it was common for the jail to receive inmates suffering from AIDS. When such inmates are first received, he said, they are treated like any other inmate with a communicable disease; they are placed in a side cell and seen by medical staff. After this initial period in a side cell, they are sent either to general population or to the lockdown area.

When Callaway was placed in the side cell, the reason given was "universal precaution." This term describes preventative practices which are used to protect health care workers and others from acquiring an unknown blood-borne disease. The precautions include: wearing gloves if there is a possibility of hand contact with body fluids; wearing gloves if there is a possibility of contact with broken skin; avoiding contact if one's own skin is broken; washing hands immediately after removing gloves; wearing a mask, gown, and goggles if there is a possibility of being splashed with bodily fluids; washing immediately if there is contact with blood or body fluids; disposing of uncapped needles or syringes in a puncture-proof container; and using a disposable ventilation device if CPR is needed. *See* Timby & Lewis, *Fundamental Skills and Concepts in Patient Care*, 5th ed. (J.B. Lippincott, 1992), pp. 357-61. Captain Pinkerton stated that the point of putting "universal precaution" as the reason was to let the jailers know that precautions were necessary while keeping the precise reason confidential.

Pinkerton said that the lockdown tank, Cell 3–J, housed a variety of inmates. Some of these were weaker prisoners who were placed there for their own protection, while others were there for medical or security reasons. He acknowledged that there was a person in the tank being held on capital murder charges, while another was accused of sexual abuse of a child. Pinkerton explained that the inmate accused of sexual abuse of a child was held in 3–J for his own

---

1. The "viral load" indicates the number of copies of the AIDS virus found in measured units of blood.

protection, rather than out of any threat which this inmate could pose to others.

Callaway was allowed to cross-examine Pinkerton and did so. During the course of this cross-examination, Callaway questioned why the response to his grievance was that any person with medical problems could be placed on 3–J. Pinkerton said that there was a medical tank, 2–C, but that there were only 10 cells there. Callaway indicated that he thought that his treatment in the Smith County Jail was a violation of the Americans with Disabilities Act and the Rehabilitation Act.

Because of the nature of the proceedings before the Court, I have accepted Callaway's allegations as true and will not consider Pinkerton's testimony to the extent that such testimony factually contradicts that given by Callaway. *Varnado v. Lynaugh,* 920 F.2d 320, 322 (5th Cir.1991).

*Legal Standards and Analysis*

*I. Statutory Claims*

The first issue to be resolved is whether the Americans with Disabilities Act and the Rehabilitation Act apply to prisons. The circuit courts are split on this question, with the Fifth Circuit not having ruled on the matter. I have examined the non-Fifth Circuit authority carefully and have determined that the better reasoning holds that the Acts do not apply to prisons.[2]

■ In *Amos v. Maryland Department of Public Safety and Correctional Services,* 126 F.3d 589 (4th Cir.1997), the Fourth Circuit noted that the "ordinary rule of statutory construction" holds that when Congress wants to alter the constitutional balance between the States and the Federal Government, this intent must be made "unmistakably clear" in the statute. *See, e.g., Atascadero State Hospital v. Scanlon,* 473

U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). The Supreme Court has explained that where application of a federal statute to a state would upset the usual constitutional balance of federal and state powers, it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides this balance. *Gregory v. Ashcroft,* 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), *citing Atascadero,* 473 U.S. at 243.[3]

■ In applying this principle, called the "clear statement rule," to the facts of the case, the Fourth Circuit held that the management of state prisons is a core state function. *See generally Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 2182, 135 L.Ed.2d 606 (1996) (federal district courts are not to allow themselves to become "enmeshed in the minutiae of prison operations"); *Preiser v. Rodriguez,* 411 U.S. 475, 492, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) (internal problems of state prisons involve issues that are "peculiarly within state authority and expertise.")

Consequently, the Fourth Circuit determined that application of the Americans with Disabilities Act and the Rehabilitation Act would alter the usual constitutional balance between the States and the Federal Government, noting that applying these Acts to state prisons could have serious implications ranging from cell construction and modification, to inmate assignment, to scheduling, and to security procedures. *Amos,* 126 F.3d at 596, *citing Torcasio v. Murray,* 57 F.3d 1340, 1346 (4th Cir.1995). However, the language of the Americans with Disabilities Act and the Rehabilitation Act did not make unmistakably clear that the statutes applied to state prisons.

---

**2.** Although Callaway was confined within a county jail, rather than the state penitentiary, the same reasoning applies.

**3.** "The powers delegated by the proposed Constitution to the Federal Government are few and defined. Those which are to remain in the State Governments are numerous and indefinite. The former will be exercised principally on external objects, as war, peace, negotiation, and foreign

commerce, with which last the power of taxation will for the most part be connected. The powers reserved to the several States will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and prosperities of the people, and the internal order, improvement, and prosperity of the State." James Madison, *The Federalist,* no. 45 (January 26, 1788).

The Fourth Circuit further noted that, not only are prisons not expressly mentioned in the Acts, prisons do not readily come to mind as the type of institution covered. For example, Title II of the Americans with Disabilities Act refers to "Public Services" and speaks of bans on discrimination in services provided to the public, but the public is excluded from prisons. Furthermore, the Act's definition of a "qualified individual with a disability," set out in 42 U.S.C. § 12131(2) describes a person "who meets the essential eligibility requirements for receipt of services or the participation in programs or activities." The Fourth Circuit held that the terms "eligible" and "participate" imply voluntariness on the part of an applicant, rather than a state prisoner who is held against his will. The use of such terms gives additional force to the conclusion that Congress did not make unmistakably clear that the Acts were to apply in the prison context.

The Tenth Circuit has held that the Rehabilitation Act does not apply to federal prisoners because the Federal Bureau of Prisons does not fit the definition of "programs or activities" covered by the Act. *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir.1991). This reasoning was also applied by the Tenth Circuit in *White v. State of Colorado*, 82 F.3d 364 (10th Cir.1996).

Although the Ninth Circuit has specifically held that the Rehabilitation Act applies to state prisons, *see Bonner v. Lewis*, 857 F.2d 559 (9th Cir.1988), a later decision by that Court has stated that the Act was not designed to deal specifically with the prison environment and that there was no indication that Congress intended it to apply to prison facilities irrespective of the reasonable requirements of effective prison litigation. *Gates v. Rowland*, 39 F.3d 1439, 1446-7 (9th Cir.1994). The Ninth Circuit concluded that the applicable standard for review of Rehabilitation Act claims is equivalent to the standard for reviewing constitutional claims in the prison setting. *Gates*, 39 F.3d at 1447. This holding is the functional equivalent of a

decision that the Act does not apply, inasmuch as the general standard for reviewing prison claims is the standard which would be used in the absence of the Rehabilitation Act.[4] Furthermore, this holding simply engrafts onto the Rehabilitation Act a standard which does not exist within the text of the Act; neither the Americans with Disabilities Act nor the Rehabilitation Act provide for analyzing claims under a standard of deliberate indifference. *Amos*, 126 F.3d at 600.

The Seventh Circuit has held that it is "far from clear" that prisoners should be considered "qualified individuals" under the Act. The Court noted that it was highly unlikely that Congress intended to "mainstream" disabled prisoners into the already highly restrictive prison society and that significant practical objections exist to requiring prisons to comply with the directives of the Act. It would be particularly difficult when one notes that alcoholism and other addictions are "disabilities" under the Act, and these problems affect a substantial portion of the prison population. *Bryant v. Madigan*, 84 F.3d 246, 248 (7th Cir.1996). The Court specifically stated that the exception for prisoners in the Americans with Disabilities Act may be found in the definition of "qualified individuals." *Bryant*, 84 F.3d at 249. This exception is consistent with the reasoning, set forth above, that inasmuch as prisoners are not voluntarily "participating" in the prison routine, they are not qualified individuals within the meaning of the Act.

However, the Seventh Circuit has recently appeared to retract this position. In *Crawford v. Indiana Department of Corrections*, 115 F.3d 481 (7th Cir.1997), the Court held that the Rehabilitation Act and the Americans with Disabilities Act did apply to state prisons. In reaching this conclusion, the Seventh Circuit acknowledged that incarceration is not a program or activity in which persons might wish to participate, but said that the broad language of the Act brought prisoners within its sweep.

---

4. In other words, the Ninth Circuit would analyze prisoner claims under the Americans with Disabilities Act and the Rehabilitation Act by using the standard of deliberate indifference to a serious medical need, which is the same standard that would be applied if the Acts were not applied to prisons. *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994).

In its discussion, the Seventh Circuit gives little more than passing reference to the purpose of the clear statement rule, which is to maintain a balance between state and federal power by ensuring that federal statutes which infringe upon core functions of the states clearly and unmistakably include these core functions within their terms. The Court referred to the interest of the States in being able to fulfill their traditional core functions without federal interference as "quasi-constitutional," citing *Gregory*. *Gregory*, however makes clear that the clear statement rule (also called the "plain statement rule") is "an acknowledgement that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." *Gregory*, 501 U.S. at 461. Hence, I have concluded that the Seventh Circuit's decision in *Crawford* is not persuasive.[5]

Similarly, the Third Circuit has held that the Americans with Disabilities Act and Rehabilitation Act apply to state correctional facilities based on the language of the statute, which the Court described as "broad" and "all-encompassing." *Yeskey v. Commonwealth of Pennsylvania Department of Corrections*, 118 F.3d 168 (3rd Cir.1997) The Third Circuit also noted that regulations promulgated by the Department of Justice list correctional facilities as covered entities under the Acts. *Yeskey*, 118 F.3d at 172.

The Third Circuit said that notwithstanding the fact that operating prisons was a core function of the States, and the application of these Acts to the States gave rise to the specter of federal court management of state prisons, the Acts applied to state prisons because Congress made clear that they should do so. *Id.*, at 173.

However, this decision relies on the all-encompassing nature of the statutes in determining that prisons should be covered. The Court stated that the "clear statement rule" did not apply because the broad sweep of the

statute itself was evidence that Congress intended the statute to apply to prisons. *Id.*

This is circular reasoning. The broad sweep of a statute, altering the balance of state and federal relations in reference to a core function of state government, requires a clear statement that such alteration is intended. *Gregory*, 501 U.S. at 461. If the broad sweep of the statute by itself were enough, there would never be a need for a plain and clear statement, and the clear statement doctrine would have no meaning.

The Third Circuit also stated that the cases relied upon by the Fourth Circuit in *Torcasio* refer to instances in which there was no express waiver of the State's immunity from suit, whereas the Americans with Disabilities Act and the Rehabilitation Act both contain such waivers. However, the issue here is not whether or not the State is amenable to suit at all, as would be the case in an Eleventh Amendment immunity question, but whether the sweep of the statute necessarily encompasses the operation of prisons, a core function of state government, absent a clear and plain statement by Congress that such intrusion into an area of traditional state power was intended. *Amos*, 126 F.3d at 600–01.

Finally, the Eleventh Circuit has held that the Rehabilitation Act applies to prisons. *Harris v. Thigpen*, 941 F.2d 1495, 1522 n. 1 (11th Cir.1991). However, the question of the Act's applicability was not before the Court, and so the holding was dicta. Further, the Eleventh Circuit's dicta relies on *Bonner*, a case from which the Ninth Circuit has appeared to retreat.

*The DOJ Standards*

■ The Third and Seventh Circuits found significance in the fact that the Department of Justice has implemented regulations defining the kinds of programs and benefits covered under the Rehabilitation Act. The term "program" is defined as "the operations of the agency or organizational unit of govern-

---

5. Even the Seventh Circuit's opinion makes clear that parallels exist in which the clear statement rule has made exceptions for inmates. No court has ever held that inmates are covered by the Fair Labor Standards Act, even though that Act, like the ADA and RA, is written in sweeping language which, on its face, would seem to include inmates. *See Vanskike v. Peters*, 974 F.2d 806 (7th Cir.1992).

ment receiving. or substantially benefiting from the federal assistance awarded, e.g. a police department or department of corrections." 28 C.F.R. § 42.540(h). The term "benefit" is defined to include sentencing and confinement. 28 C.F.R. § 42.540(j). The Third Circuit also notes that the preamble to the Americans with Disabilities Act regulations also refers specifically to prisons. *Yeskey,* 118 F.3d at 171. The sole reference to prisons in the preamble to the Act appears in 28 C.F.R., pt. 35, appendix A, p. 478 (July 1, 1997, rev.), and states as follows:

> A public entity is not, however, required to provide attendant care, or assistance in toileting, eating, or dressing to individuals with disabilities, except in special circumstances, such as where the individual is an inmate of a custodial or correctional institution.

The intrusiveness of the Justice Department regulations creates "enormous" implications for the balance of power between the States and the Federal Government. *Amos,* 126 F.3d at 606. Hence, the courts are not bound to defer to the administrative agency's interpretation of the statute absent a clear and unambiguous statement by Congress, in the language of the statute, that the alteration of the balance between the states and the Federal Government is intended. *Commonwealth of Virginia Department of Education v. Riley,* 106 F.3d 559, 566 n. 6 (4th Cir.1997), *citing Will v. Michigan Department of State Police,* 491 U.S. 58, 65, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). The Fourth Circuit rejected the notion that implementing regulations could clear up ambiguities in the statute, noting that the Supreme Court has left primarily to the political process the protection of the States against intrusive exercises of Congress' Commerce Clause powers, and so certainty is required that Congress intended such intrusive exercises. *Riley,* 106 F.3d at 567, *citing Gregory,* 501 U.S. at 460. *Gregory,* in

turn, cited *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), and noted that to give the state-displacing weight of federal law to mere congressional ambiguity would evade the very procedure which *Garcia* relied upon to protect the interests of the States. *Gregory,* 501 U.S. at 464.

Although it would seem that these statutes, 28 C.F.R. § 540 and the preamble to the regulations implementing the Act, make clear that the Acts apply to prison, their all-encompassing sweep does not fulfill the requirement of a clear statement of intent to alter state-federal relations. This is particularly true when one notes the absurdity of defining "benefit" in such a broad and general way as to include sentencing and confinement.[6]

Because I am convinced that Congress did not clearly and unambiguously include the states' core function of prison operation within the Americans with Disabilities Act or the Rehabilitation Act, I find that the Department of Justice regulations are not controlling.

### Summary of the Statutory Claims

In conclusion, I find that neither the Americans with Disabilities Act, nor and the Rehabilitation Act, contain a clear statement unambiguously evincing Congress' intent to apply these laws to the operation of a prison, which is a core function uniquely within the authority of the State. In the absence of such a clear statement, the balance of power between the States and the Federal Government has not been tipped, leaving the Americans with Disabilities Act and the Rehabilitation Act inapplicable to this core function. However, even though the Americans with Disabilities Act and the Rehabilitation Act are not applicable, Callaway retains the protections of the Eighth and Fourteenth Amendments, and his claims will be analyzed under these standards.[7]

---

**6.** The absurd and over-generalized nature of these regulations can be seen in the fact that the definition of the term "program" includes the operations of the agency, and the definition of the term "benefit" includes sentencing; thus, when an inmate is sentenced to death, and this

sentence is carried out by the agency, his execution is by definition a "benefit."

**7.** Under the Ninth Circuit's decision in *Gates,* as noted above, the Acts would apply to the jail, but Callaway's claims would be analyzed, not under the standards set out in the text of the Acts, but

## II. Callaway's Constitutional Claims

██ The first claim raised by Callaway is that he received the wrong dose of medication, or no medication at all, for some 19 days. At several points in his testimony, however, he characterized this as a "mistake." Callaway conceded that the intake paperwork said that he was supposed to receive 400 mg of Crixivan, but said that the nurse, not he, had written this down, and that once it was in writing, he had difficulty in getting it changed.

The Fifth Circuit has said that deliberate indifference to a convicted inmate's serious medical needs could state a civil rights violation, but a showing of nothing more than negligence does not. *Norton v. Dimazana,* 122 F.3d 286, 291 (5th Cir.1997); *Jackson v. Cain,* 864 F.2d 1235, 1246 (5th Cir.1989). Simple disagreement with the medical treatment received or a complaint that the treatment received has been unsuccessful is insufficient to set forth a constitutional violation. *Johnson v. Treen,* 759 F.2d 1236, 1238 (5th Cir.1985); *Norton,* 122 F.3d at 293.

In conjunction with these holdings, the Fifth Circuit has stated that negligent or mistaken medical treatment or judgment does not implicate the Eighth Amendment and does not provide the basis for a civil rights action. *Graves v. Hampton,* 1 F.3d 315, 319–20 (5th Cir.1993). Here, Callaway expressly said that he was given the wrong dose of Crixivan as a result of "a mistake." This is consistent with the records and the other testimony in the case. Callaway stated that when he saw Dr. Stockton, the first action taken by the doctor was to correct the mistake and order the proper dosage.

Callaway has offered nothing to show that he was given the wrong dosage of Crixivan as a result of deliberate indifference to his serious medical needs, as opposed to a simple mistake or to negligence by the medical staff at the jail. His claim on this point must fail.

██ To the extent that Callaway is suing the University of Texas Health Center at Tyler over his medical care, his claim must fail on the basis of sovereign immunity. The University of Texas Health Center is an agency of the State of Texas, and Callaway's claims against UTHC are in effect raised against the State of Texas. A lawsuit against a state agency is barred by the doctrine of sovereign immunity; the Supreme Court has held that in such a case, when the State itself is the real party in interest named as Defendant, the lawsuit is barred regardless of whether it seeks damages or injunctive relief. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 101–02, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *accord, Hafer v. Melo,* 502 U.S. 21, 27, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). The University of Texas Health Center at Tyler must be dismissed as a party to this lawsuit.

██ The fact that Callaway did not see Dr. Stockton until he had been in the jail for 19 days, or Dr. Perkins until he had been in the jail for 56 days, is not proof of deliberate indifference to his serious medical needs either. He conceded that he saw nurses and went to the clinic numerous times. The Fifth Circuit has held that an inmate who had been examined by medical personnel on numerous occasions failed to set forth a valid showing of deliberate indifference to serious medical needs. *Spears,* 766 F.2d at 181; *Norton,* 122 F.3d at 293.

Moreover, the fact that Callaway saw nurses, rather than a doctor, in the first three weeks of his confinement in the jail is not a constitutional violation. The Fifth Circuit has observed that the fact that medical care given is not the best that money can buy, and the fact that a dose of medication may occasionally be forgotten, does not amount to deliberate indifference to serious medical needs. *Mayweather v. Foti,* 958 F.2d 91 (5th Cir.1992). This claim is without merit.

Next, Callaway complained about his cell assignments during his stay in the jail. He stated that he was initially placed in a "side cell," and that he remained there, by himself, for about a week. Thereafter, he was moved to a locked-down cell in tank 3–J.

The testimony showed and Callaway did not dispute that while confined in the side

under the constitutional standards applicable to prisoner claims under the Eighth and Fourteenth Amendments. I do not follow this reasoning because I find the Acts inapplicable to prisons.

cell, a notation of "universal precautions" was placed in the log. Captain Pinkerton testified that this notation is a means to alert jail personnel that Callaway had a medical problem, without violating his right to privacy by disclosing the precise nature of this problem.

After Callaway had been in the side cell for a week, he was transferred to Tank 3–J. He said that "the worst" inmates were confined here, indicating that one of his fellow prisoners was charged with capital murder and another with sexual abuse of a child. He also said that he believed it was jail policy to confine inmates with AIDS in this tank, apparently whether or not these inmates were "the worst" in the jail. Callaway conceded that he was no stranger to prison, having spent several years in the state penitentiary for the offense of robbery.

■ The Fifth Circuit has held that the classification of inmates is typically relegated to the broad discretion of prison officials and is a matter with which the courts are reluctant to interfere except in extreme circumstances. *Mikeska v. Collins*, 900 F.2d 833, 836 (5th Cir.1990), *modified on rehearing* 928 F.2d 126 (5th Cir.1991). Indeed, the general rule is that inmates do not have a protected liberty interest in their custodial classification. *Wilson v. Budney*, 976 F.2d 957, 958 (5th Cir.1992).

■ Callaway has failed to show an abuse of discretion in the decision to confine him to Tank 3–J. Because Callaway was an inmate with a prior conviction for robbery, an extremely serious offense, the jailers obviously did not abuse their discretion in placing him in a high-security tank.

Callaway filed a grievance regarding his placement in 3–J, and the response was that any inmate with a medical problem could be placed in that tank. This response indicates that his placement on 3–J was done for medical rather than security reasons. Even so, Callaway has failed to show an abuse of discretion. He simply makes a bald assertion, unsupported by any facts, that his placement on 3–J was due to prejudice against his medical condition. The Fifth Circuit has held that absent specific facts, a plaintiff's personal opinion as to the basis for an official's action is not sufficient evidence upon which to proceed in a Section 1983 lawsuit. *Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir.1995); *see also Whittington v. Lynaugh*, 842 F.2d 818, 820 (5th Cir.1988).

Captain Pinkerton stated that the jail had one medical tank, with a total of ten cells. He added that the tank in which Callaway was placed, although locked down in the sense that inmates did not have free access to the dayroom, did not carry with it a deprivation of any other privileges, and Callaway conceded that he was not prohibited from having visitors, recreation, or access to legal materials.

■ The Fifth Circuit has held that segregation of inmates infected with the AIDS virus into a special section of the prison is not a *per se* constitutional violation. *Moore v. Mabus*, 976 F.2d 268, 271 (5th Cir.1992).[8] Thus, the fact that Callaway was placed into tank 3–1 because of his medical condition does not violate any rights belonging to him under the Constitution or laws of the United States.

■ Callaway also complained that he received an inadequate diet, which caused him to feel "weak." Inmates have a constitutional right to receive reasonably adequate food. *George v. King*, 837 F.2d 705 (5th Cir.1988). In this case, of course, the adequacy of Callaway's diet must be measured in light of his medical condition.

The inmate request forms filed by Callaway do not contain a single complaint about his diet, and Callaway does not allege that he made any such complaints through the grievance procedure. The first sick call request which Callaway filed complaining about weakness due to inadequacy of the food came on July 30, 1997. He saw Dr. Perkins the very next day, July 31, and the doctor or-

8. Although the Fifth Circuit remanded *Moore* to the district court for further proceedings, this remand concerned the non-frivolous allegations raised by the Plaintiff, including the arbitrary denial of all privileges based on his medical condition and the denial of medication for this condition. The evidence here shows that Callaway was not denied all privileges and that he received adequate medical care.

dered double portions of food "when possible" for him. This order, however, did not get to the kitchen until August 6, 1997, and Callaway was released from jail on August 12.

The medical records also show that Callaway complained of "general weakness" on July 23, 1997. He was suffering from a cold at the time, and so it cannot be ascertained whether this lassitude was due to the food or to the cold. The medical records contain no indication that Callaway complained about the food when he saw the nurse that day, nor did he do so in his sick call request on July 22.

The jail records show, and Callaway does not dispute, that when he complained about the amount of food he was getting, Dr. Perkins entered an order the next day directing that he receive double portions when possible. Less than two weeks later, Callaway was released from the jail. While this may not have been the most expedient response to the problem, Callaway has failed to show either that he was receiving constitutionally inadequate food or that the jail staff was deliberately indifferent to his serious medical needs. This claim is without merit.

### The Named Defendants

Callaway named only Smith County, Sheriff J.B. Smith, and the University of Texas Health Center at Tyler as Defendants in his lawsuit. As noted above, UTHC, as an agency of the State of Texas, is immune from suit.

Callaway testified that Sheriff Smith oversees the jail and therefore is responsible for what occurs therein. This is a claim of responsibility under the doctrine of *respondeat superior*, which is generally inapplicable in Section 1983 cases.

The Fifth Circuit has held that lawsuits against supervisory personnel based on their positions of authority are claims of liability under the doctrine of *respondeat superior*, which does not generally apply in Section 1983 cases. *Williams v. Luna*, 909 F.2d 121 (5th Cir.1990). A supervisor may be held liable if there is personal involvement in a constitutional deprivation, a causal connection between the supervisor's wrongful conduct and a constitutional deprivation, or if a supervisory official implements a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force behind a constitutional deprivation. *Thompkins v. Belt*, 828 F.2d 298 (5th Cir. 1987).

Here, Callaway has failed to show any of the three prerequisites for supervisory liability by Sheriff Smith. He has not shown that Sheriff Smith was personally involved in any of his claims, nor that Sheriff Smith acted wrongfully and thereby caused a constitutional deprivation.

With respect to the policy claim, Callaway testified that he believed that Smith County had a "policy" of discriminating against prisoners suffering from AIDS. The only proof that he offered was his bald, unsubstantiated assertion that AIDS sufferers were placed in the lockdown tank. The evidence indicates that county policy provided that inmates could be placed in the lockdown tank for medical reasons.

As stated above, the fact that AIDS sufferers are placed in a special wing of the jail is not a *per se* constitutional violation. *Moore*, 976 F.2d at 271. Thus, even if such a policy did exist, Callaway has failed to show any constitutional violations therewith. Neither did he identify any other jail "policies" which may have resulted in a constitutional deprivation.

More tellingly, Callaway did not show that he had suffered a constitutional violation at all. The Fifth Circuit has held that absent primary liability, there can be no supervisory liability. *Gibbs v. King*, 779 F.2d 1040, 1046 n. 6 (5th Cir.), *cert. denied* 476 U.S. 1117, 106 S.Ct. 1975, 90 L.Ed.2d 659 (1986). Hence, his claim that Sheriff Smith is liable to him is without merit.

Finally, Callaway named Smith County, Texas, as a Defendant in his lawsuit. To establish county or municipal liability under Section 1983, a plaintiff must demonstrate a policy or custom which caused the constitutional deprivation. A municipality may not be held strictly liable for the acts of its non-policymaking employees under a respondeat superior theory. It cannot be held

liable solely because it employs a tortfeasor. Rather, only when the execution of a county's policies or its customs deprives an individual of constitutional or federal rights, does liability under Section 1983 result. *Colle v. Brazos County, Texas,* 981 F.2d 237, 244 (5th Cir. 1993).

As with Sheriff Smith, the only policy alleged by Callaway is that AIDS sufferers are placed in the lockdown tank. Even if such a policy exists, it does not represent and did not work a violation of Callaway's constitutional rights. Callaway does not allege, nor could he do so with any plausibility, that Smith County or Sheriff Smith have "policies" of denying medical care or adequate food to AIDS patients. His claim against Smith County is without merit.

*Conclusion*

28 U.S.C. § 1915(e)(2) provides that a court shall dismiss a lawsuit at any time if it determines that the allegation of poverty is untrue or that the action or appeal is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory. *Neitzke v. Williams,* 490 U.S. 319, 325–7, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). A complaint fails to state a claim upon which relief may be granted if, as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Id.* 490 U.S. at 327, *citing Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *see also Blackburn v. City of Marshall,* 42 F.3d 925, 931 (5th Cir. 1995).

In this case, Callaway's complaint lacks any arguable basis in law and fails to state a claim upon which relief may be granted. *See generally Thompson v. Patteson,* 985 F.2d 202 (5th Cir.1993). It is accordingly

ORDERED that the above-styled civil action be and hereby is DISMISSED with prejudice as frivolous and for failure to state a claim upon which relief may be granted. 28 U.S.C. § 1915. It is further

ORDERED that all motions which may be pending in this action are hereby DENIED.