**LIBERTY RESOURCES, INC., Plaintiff,**

v.

**PHILADELPHIA HOUSING AUTHORITY, Defendant.**

Civil Action No. 03–4455.

United States District Court, E.D. Pennsylvania.

Dec. 18, 2007.

554

Robert W. Meek, Philadelphia, PA, for Plaintiff.

Abbe F. Fletman, Flaster/Greenburg PC, Alan C. Kessler, Barry M. Klayman, Brian P. Flaherty, Scott A. Caulfield, Wolf Block Schorr and Solis–Cohen LLP, Philadelphia, PA, for Defendant.

## *MEMORANDUM AND ORDER*

ANITA B. BRODY, District Judge.

## I. *INTRODUCTION*

Liberty Resources, Inc. (LRI), a federally-funded interest group for persons with disabilities, brought this suit against the Philadelphia Housing Authority (PHA) claiming PHA's Housing Choice Voucher Program (HCVP or alternatively HCV Program) discriminates against mobility disabled program participants in violation

of Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 794, Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, and various implementing regulations promulgated by the Department of Justice (DOJ) and Department of Housing and Urban Development (HUD). Both parties moved for summary judgment. Defendant alleges that Plaintiff does not have standing to sue and that even if Plaintiff had standing the case should be dismissed because no violation of the ADA or RA exists. The well-developed record shows that PHA has not failed to provide mobility disabled people with meaningful access to the benefits of the Housing Choice Voucher Program. Therefore, Defendant has not violated the ADA or RA.

PHA is one of many housing authorities throughout the country that administers a Housing Choice Voucher Program, also known as Section 8 Housing. The HCV Program provides qualified low-income families vouchers to subsidize the rental of privately-owned units in the housing market. Unfortunately, Philadelphia has a significant shortage of handicapped accessible housing in the private marketplace. As explained by PHA, "there are far more people with physical disabilities or mobility impairments seeking housing than there are rental properties equipped to accommodate them." January 16, 2004 PHA Letter to HCVP–Participating Landlords.

This problem is not unique to Philadelphia. Housing authorities in two other cities facing similar accessible unit shortages, Chicago and Baltimore, have aggressively tackled the problem by funding accessibility modifications to privately-owned units rented by Section 8 participants [1] and by providing individualized search assistance to disabled Section 8 program participants.[2] PHA has been encouraged to undertake similar initiatives. HUD issued a notice stating that housing authorities should offer Section 8 participants "specialized housing search assistance to families with a disabled person to locate accessible units if requested." U.S. Dep't of Housing and Urban Dev., Notice PIH 2005–5(HA) at 3 (Feb. 1, 2005) (explaining and providing guidance to implement President Bush's New Freedom Initiative and Executive Order 13217). A subsequent HUD notice mentioned unit modification for accessibility purposes as a type of development activity related to Section 8 tenant-based rental assistance. U.S. Dep't of Housing and Urban Dev., Notice PIH 2006–5(HA) at 4 (Jan. 13, 2006) (implementing the HCVP funding provisions of the 2006 HUD Appropriations Act).

The plaintiff, LRI has proposed several modifications to PHA's HCV Program that include funding accessibility modifications to rented units, providing individualized search assistance, and increasing rents

---

1. The Chicago Housing Authority (CHA) pays a third party public interest organization, Access Living for People with Disabilities of Metropolitan Chicago, to administer this modification program. Common modifications to Section 8 private rental housing to the disabled include the installation of ramps and lifts and bathroom design changes. In 2005, approximately 50 housing units were modified in some fashion on a budget of $120,000.

2. The Housing Authority of Baltimore has undertaken by consent decree to assist disabled Section 8 program participants in finding accessible units. For example, it offers free phone use and free local newspapers as search assistance tools, tracks information about the accessibility features of units in a computerized database searchable by disabled Section 8 participants, and has a special protocol to assist housing authority staff when they have reason to believe that a voucher holder has a disability. The protocol requires that housing authority staff investigate voucher holders' needs and advise them of the assistance available.

paid for accessible housing. Despite HUD's suggestions and directions, and PHA's substantial discretion to modify its programs, PHA has refused to make several modifications to the HCV Program proposed by LRI.

Prior to this lawsuit, staff in LRI's Housing Advocacy Department spoke with PHA officials privately and publicly about problems relating to the lack of accessible housing for disabled voucher holders. Since instituting this lawsuit, both sides have engaged in considerable discovery, and at my urging, have undergone negotiations to reach a settlement before a magistrate judge. Unfortunately, these efforts have failed to produce an accord.

The record contains several examples where PHA's efforts to assist disabled voucher holders in renting accessible units has been less than ideal. The question before me, however, is whether PHA's meager efforts, to date, are so legally insufficient that PHA has denied disabled people meaningful access to program benefits or discriminated against them in the HCV Program. I find that the core services that HCVP provides are consistent with the statutory mandates of the RA and ADA and are available to all program participants. Furthermore, there is no statutory or regulatory requirement that HCVP

expand these core services. Therefore, the HCV Program satisfies the minimal mandates of the ADA and RA. I grant summary judgment to PHA. I note however, that If PHA fails to accommodate mobility disabled people in a manner at least consistent with the current practices, it exposes itself to liability in the future. Additionally, as an aside, I hope that PHA will ultimately meet the challenges of providing accessible housing to mobility disabled people in a similar fashion to the work done in Baltimore and Chicago.

## II. *FACTUAL BACKGROUND*

### A. The Parties

Liberty Resources, Inc. is a designated "center for independent living" (CIL) created under federal law, 29 U.S.C. § 796f–4. As a CIL, federal statute and regulations require that LRI assists people with significant disabilities to advocate for themselves in order to achieve equal access to society, which includes access to publicly and privately funded programs, activities, and services. Specifically, federal statute mandates that LRI "shall provide independent living core services." [3] 29 U.S.C. § 796f–4(b)(5). LRI employs approximately 140 people. Approximately 2% of LRI's $29 million annual budget is derived from federal funding. Federal law requires that

---

**3.** As part of its mandate, in 2002, LRI created a Housing Advocacy Department to address housing issues faced by people with disabilities. The Housing Advocacy Department consists of four staff members who provide various services to consumers, including to mobility disabled HCVP voucher holders. To assist HCVP voucher holders and people on the HCVP waiting list, LRI does the following:

· Provides voucher holders with an independent database of accessible units.
· Directs consumers to other sources of information regarding available accessible units, such as the Pennsylvania Housing Finance Agency (PHFA) website and the City of Philadelphia's Office of Housing and Community Development (OHCD).

· Works directly with landlords to encourage them to provide accessible housing to HCVP voucher holders.
· Assists clients in obtaining funding for accessibility modifications they desire to make on their housing units.
· Informs HCVP voucher holders that they may be eligible for low or no interest loans, to assist them in making accessibility modifications, from the Pennsylvania Initiate on Assistive Technology.
· Provides mobility disabled people with transportation to and from PHA and to locations with possible accessible units for rent.
· Assists voucher holders in requesting extensions to their vouchers.
· Accompanies voucher holders to PHA meetings and assists them with PHA paperwork.

the majority of board directors and staff of each Center for Independent Living be comprised of their constituency, which is people with disabilities. 29 U.S.C. §§ 796f–4(c)(2), 796f–4(c)(6). Of LRI's sixteen board members, eleven are individuals with mobility disabilities. Mobility-disabled individuals also make up a majority of three key LRI committees: the Housing Committee, the Strategic Planning Committee, and the Advocacy Committee.

Philadelphia Housing Authority is a public housing authority that receives federal financial assistance from the United States Department of Housing and Urban Development. PHA administers two voucher programs, one project-based and another tenant-based. The project-based voucher program provides low income people with subsidized housing owned by either PHA or private developers who manage the properties under contract with PHA. The tenant-based Housing Choice Voucher Program gives vouchers to low income households to subsidize the rental of units privately-owned by landlords who voluntarily participate in the program. Unlike project-based voucher holders, HCVP voucher holders have the flexibility to choose from units available for rent throughout the private housing market.

## B. The Housing Choice Voucher Program

In 2005, approximately 17,000 individuals received PHA-issued HCVP vouchers and rented approximately 16,700 units. Approximately 6,500 individuals were on a waiting list to receive vouchers.

The Housing Advocacy Department enabled LRI, in a two year period from 2003–2004, to provide counseling and housing assistance to approximately 75–100 mobility disabled people on the HCVP waiting list and to approximately 30–50 mobility disabled voucher holders.

4. Unlike PHA's contract with HUD, the Chicago Housing Authority specifically agreed to

The HCV Program was established pursuant to Section 8 of the United States Housing Act. 42 U.S.C. § 1437. "In the Housing Act, Congress declared that it is this Nation's policy to employ its funds to 'remedy the unsafe housing conditions and the acute shortage of decent, safe and affordable dwellings for low income families,' and to vest responsibility, flexibility and accountability in the [Public Housing Authorities], the entities that administer the programs which provide federal housing assistance." *Powell v. Hous. Auth. of the City of Pittsburgh*, 571 Pa. 552, 812 A.2d 1201, 1203 (2002) (quoting 42 U.S.C. § 1437(a)(1)(A)).

Under its agreement with HUD, the Philadelphia Housing Authority is given substantial discretion over its spending and organization of the Housing Choice Voucher Program. HUD's agreement with PHA in regard to HCVP, states that "[u]nder this Program, the PHA may be authorized to determine . . . [a]djustments to the payment standard; [t]ype and level of supportive services to be provided to tenants; and [p]rograms, services and terms available to landlords to insure availability of affordable quality units throughout the city of Philadelphia." HUD/PHA Moving to Work Demonstration Agreement, 11.[4]

PHA's process of voucher distribution and use, for both disabled and non-disabled HCVP voucher holders, is as follows:
· Eligible applicants,[5] not already holding vouchers, are placed on a waiting list.

"work with various organizations to expand landlord participation . . . and . . . take special initiatives to expand choices for . . . accessible housing (including CHA's proposed access improvement fund)." CHA Agreement, Resident Protection Agreement, 8.

5. Eligibility is based upon annual gross income, family size, and criminal record. PHA

· After reaching the top of the waiting list, an applicant must attend an Initial/Transfer Briefing Session conducted by PHA. At this briefing, PHA gives applicants a packet of information describing how the program works. At the end of the briefing, PHA issues a voucher to the applicant. These vouchers are good for sixty days.

· To facilitate the housing search, PHA distributes a Section 8 Unit Availability Listing, which contains all currently available participating units, including all accessible units, known by PHA to accept vouchers. PHA maintains and regularly distributes this list. PHA also regularly holds housing fairs for the purpose of matching voucher holders with participating landlords. Other than these two services, PHA leaves voucher holders to rely upon other resources—such as newspapers, telephones, churches, the internet—to find units with landlords willing to accept an HCVP voucher.

· Once a voucher holder and landlord agree to rent, the landlord must undertake a series of steps to receive approval from PHA. The landlord completes paperwork and then PHA inspects the unit premises for compliance with HUD standards, as per 24 C.F.R. § 982.401(a)(3). Any substandard deficiencies must be corrected by landlords before PHA will enter into a contract with them. Then PHA and the landlord come to an agreement on the monthly rent to be charged for the unit.[6] Finally, landlords new to the HCV Program must attend a property management course for a $200 fee.

Beyond the general guidance PHA provides to all voucher holders and landlords, PHA has several practices and procedures it implements that assist disabled voucher holders. Policies that assist the mobility disabled include:

· A willingness, upon request, to grant voucher extensions or in extreme circumstances to renew an expired voucher for disabled voucher holders who cannot find accessible housing.[7]

· A willingness, upon request, to grant higher than normal rent rates for certain accessible units.[8]

---

does not know the number of eligible HCVP voucher holders or people on the HCVP waiting list who have mobility disabilities or need accessible units.

6. In line with HUD regulations, PHA sets the payment standard for each rental unit at between 90% and 110% of fair market rental value.

7. Under HUD regulation 24 CFR § 982.303(b), PHA may grant extensions to vouchers, which normally expire after sixty days, and it consistently has done so for mobility disabled voucher holders when requested.

8. Under HUD regulation 24 CFR § 982.503(c)(2)(ii), higher than normal rental rates, called exception rates, may be granted for certain units upon HUD's approval. "The HUD Field Office may approve an exception payment standard amount within the upper range if required as a reasonable accommodation for a family that includes a person with disabilities." 24 CFR § 982.503(c)(2)(ii). Normally payment standard amounts are based on unit size and range between 90% and 110% of "fair market rents" for Philadelphia (as determined by HUD). The upper range for exception rents is between 110% and 120% of fair market rent.

As of May 2006, PHA had not received any requests for exception rent that were "required" or necessary to enable a disabled voucher holder to rent an accessible unit. This may result because PHA only informs landlords verbally that they might be eligible to receive exception rents for accessible units and does not explain how to request an exception rate. Provision of more detailed written information about exception rates is the type of reform that PHA might well undertake or implement.

- A willingness, upon request, to allow disabled voucher holders to rent units with an additional bedroom for a live-in aide or extra equipment.

- A willingness, upon request, to have a one-on-one Initial/Transfer Briefing Session for a disabled voucher holder.

- An Accessibility Coordinator who trains PHA staff regarding mobility and accessibility issues and also assists disabled voucher holders in locating accessible units.[9]

- Referral of disabled voucher holders to 1260 Housing Development Corporation (1260 HDC) for assistance in locating accessible units.[10]

- Encouragement of landlords who attend PHA's weekly landlord briefing sessions and may be interested in participating in HCVP, to undergo accessibility modifications, as well as inquiring into whether landlords already have accessible units.[11]

- Encouragement of landlords already participating in HCVP to refer to the Program other known landlords with accessible units.

In addition to the above policies designed to assist the mobility disabled, which were in place prior to this lawsuit, soon after LRI filed a complaint in this case, PHA developed a marketing plan designed to identify and attract landlords with accessible units into the HCV Program. This plan was implemented by PHA in the following manner:

- On January 16, 2004, PHA sent a letter to all landlords already participating in HCVP and inquired whether they had accessible units or were interested in making units accessible. The letter explained that PHA could pay higher exception rents for accessible units. It also offered information about possible low interest loans to assist with making accessibility modifications.[12]

- In cooperation with Fleet Bank, PHA created the Disabilities Access Rehab Loan (DARL) program designed to offer low interest loans to landlords making accessibility modifications. However, the program expired in September 2005.[13]

9. Plaintiff highlights the fact that the assistance the Accessibility Coordinator provides to disabled voucher holders is minimal and typically involves providing a voucher holder with a list of buildings constructed with Philadelphia City funding that may have accessible units. Unfortunately, the Coordinator lacks knowledge as to whether any of the buildings on the list accept HCVP vouchers. The Coordinator's priorities involve PHA's conventional project-based housing programs, thus her involvement with HCVP is minimal. PHA should consider either making the HCVP a priority of the Accessibility Coordinator or creating a new position to address the needs of the disabled in the HCV Program.

10. In June 2003, PHA entered a five-year Memorandum of Understanding with 1260 Housing Development Corporation (1260 HDC), an organization that provides housing to people with special needs and specifically concentrates on assisting people with chronic mental illness. The Memorandum merely requires 1260 HDC to do its best to provide search assistance to up to fifty voucher holders. PHA refers disabled voucher holders to 1260 HDC when they request assistance. However, the contact person at 1260 HDC was not aware of this policy at the time of litigation. Unfortunately, PHA keeps no records of making such referrals and 1260 HDC statistics show that only two out of twenty five mobility disabled voucher holders referred by PHA actually received services from 1260 HDC.

11. Between September 2003 and June 2005, seven landlords indicated that they had accessible units, but PHA did not follow-up to encourage these landlords to participate in HCVP.

12. Approximately seventy-two landlords responded to the letter.

13. The bank allowed the program to expire because of the minimal response it received. PHA has not contacted other financial institu-

· In May 2004, PHA made one presentation to HAPCO, a local landlord group, in an effort to convince it to make accessible units available to voucher holders. PHA contacted at least four other landlord groups and housing associations offering to make similar presentations, but they were not interested. (Doc. 107, SUF # 100).

· In July 2004, PHA conducted two informational meetings for HCVP-participating landlords who responded to the letter sent on January 16, 2004. At these meetings, PHA explained the benefits of making units accessible, including higher rents paid by PHA, tax incentives, and low interest loans from Fleet Bank.[14]

· PHA conducted a telephone survey of 138 apartment complexes in the region to determine whether they had accessible units.[15]

The marketing plan did not increase the number of accessible HCVP units. Ultimately, PHA found that there was little willingness on the part of landlords to add accessibility features to their units, or to accept voucher holders if they already had accessible units. Aside from two surveys of the Philadelphia area rental market for accessible units, PHA has not undertaken any similar marketing efforts to attract landlords with accessible units into the HCV Program.

LRI contends that the services provided to mobility disabled voucher holders are insufficient and violate the ADA and RA. LRI alleges that to satisfy the needs of mobility disabled voucher holders, approximately 5% of units participating in the HCVP program (850 units) would have to be accessible. Unfortunately, between March 2005 and October 2005, among 1,056 unduplicated units on fourteen Section 8 Availability Listings, only three units were identified by landlords as accessible. Clients who are HCVP voucher holders have been frustrated by PHA's inefficiencies and poor customer service. Some of LRI's complaints about the HCV Program are based upon the following:

· Mobility disabled voucher holders have had difficulties contacting service representatives to get assistance in locating accessible housing.

· The Section 8 Availability Listing denotes certain units as accessible but, since September 2005, no longer contains any details about specific amenities in each unit.

· Although PHA has a Section 8 Disability Accommodation Request form (completed by PHA for HCVP voucher holders with disabilities who need accommodations) PHA does not require its staff to use this form to keep track of disabled voucher holders and their needs.

· No procedure for requesting exception rents exists, and neither voucher holders nor landlords are informed about how much the exception rates might be or how they can be requested.

· PHA has no written policy explaining how a voucher holder can request a voucher extension.

· PHA neither offers nor explains to the mobility disabled how to request transportation to or from meetings at PHA.

These concerns about HCVP, along with many others, form the basis of LRI's claims against PHA.

tions to create similar programs and no such program has been created since then.

**14.** Approximately 48 people attended these presentations.

**15.** Unfortunately, the survey failed to define "accessible."

LRI asserts that PHA must make the following changes in order to comply with the ADA and the RA:

- Create a housing modifications fund, analogous to the Chicago Housing Authority's fund, to finance accessibility modifications to units rented by HCVP participants.
- Provide mobility disabled voucher holders with individualized search assistance.
- Seek HUD approval to pay higher across-the-board rents for accessible units (rather than seek individual exception rents).
- Develop policies and procedures to govern requests for exception rents for accessible HCVP housing, which include: publicizing the availability of exception rents to landlords and tenants; informing landlords that they can receive higher rents by making their properties accessible; and expediting requested exception rents.
- Eliminate bureaucratic obstacles to encourage landlords with accessible housing to participate in HCV Program and rent to voucher holders with mobility disabilities. For example, waive the $200 fee for the training session that landlords must attend to participate in the HCVP, and streamline the course for landlords with accessible units.[16]
- Increase the effectiveness of landlord outreach by: refuting the common myth among landlords that acceptance of one HCVP tenant requires acceptance of all voucher holders; providing landlords that have accessible housing with a list of tenants looking for accessible housing; providing information on making housing accessible to existing Housing Choice landlords; and following up on Landlord Briefing Surveys to encourage landlords with accessible housing to participate in the HCV Program.

LRI asks this Court to issue declaratory relief that the Defendant has violated the ADA and RA and injunctive relief to enjoin the unlawful conduct.

### III. STANDARD OF REVIEW

Summary judgment should be granted under Federal Rule of Civil Procedure 56(c) "if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law." *Kornegay v. Cottingham*, 120 F.3d 392, 395 (3d Cir.1997). A factual dispute is "genuine" if the evidence would permit a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In order to survive summary judgment, a plaintiff must make a showing "sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must draw all reasonable inferences in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### IV. DISCUSSION

#### A. PHA Has Representational Standing to Raise Its Claims

Although, the central issue in this litigation is whether Defendant has violated the RA and ADA, PHA contends

---

**16.** In Defendant's motion for summary judgment, PHA states that it "would be willing, if asked, to defer payment of the fee until after the landlord has located a tenant and begun receiving rent." Doc. # 105, 9.

that regardless of the answer, LRI cannot bring forth these claims because it lacks standing. Generally, a plaintiff may only assert its own legal rights, and may not claim relief on the basis of others' rights. *Kowalski v. Tesmer*, 543 U.S. 125, 129, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004). However, "[a]bsent injury to itself, an association may pursue claims solely as a representative of its members. By permitting associational standing, federal courts 'recognize[ ] that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others.' " *Pa. Psychiatric Soc'y v. Green Spring Health Servs.*, 280 F.3d 278, 283–284 (3d Cir.2002) (quoting *Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Brock*, 477 U.S. 274, 290, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986)).

■ An organization has representational standing, that is standing to bring suit on behalf of its members, when 1) its members would otherwise have standing to sue in their own right, and 2) the interests that the organization seeks to protect are pertinent to that organization's purpose. *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), superseded by, *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 554–58, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996) (holding that a third requirement—that the claim asserted and relief requested do not require participation of individual members in the lawsuit—is merely prudential and unnecessary if the first two elements are satisfied).

■ PHA does not dispute that the welfare interests of mobility disabled people, including housing and access to government services, are germane to LRI's organizational purpose. *Cf. Addiction Specialists, Inc v. Township of Hampton*, 411 F.3d 399, 405–06 (3d Cir.2005) (finding

that the broad language of the ADA and RA indicate Congressional intent to confer representational standing on the operator of a methadone clinic). However, PHA disputes that LRI meets the first prong of the test for representational standing because it believes that LRI members would not otherwise have standing to sue in their own right.

■ The first prong is satisfied if an association has an "indicia of membership." *Hunt*, 432 U.S. at 344–45, 97 S.Ct. 2434. Although LRI is not a membership based organization, a majority of LRI's directors and members of key committees are people with disabilities. This degree of decision-making responsibility given to LRI's constituents is a strong indicia of membership. *Cf. Hunt*, 432 U.S. at 345, 97 S.Ct. 2434 (finding indicia of membership when an organization provided the means to express collective views and protect collective interests).

■ PHA claims that LRI does not meet the "indicia of membership" requirement because not all of LRI's consumers, including its decision-makers, participate in the HCV Program, and thus not all consumers can show an injury by PHA. However, representational standing does not require that every individual in an organization, nor every decision-maker in an association, suffers the precise, direct injury allegedly caused by the defendant. *See Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). On the contrary, an organization can achieve representational standing if "its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Id. See also Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1112 (9th Cir.2003) (finding the first prong satisfied when only seven constituents of the plaintiff organization would

have had standing to sue on their own behalf).

LRI has alleged, and the record reflects, that at least some of its constituents participate in the HCV Program. Thus, LRI has standing under Article III to sue PHA on behalf of its constituents.

## B. There is No Violation of the ADA or RA Because Defendant Has Not Denied Mobility Disabled People the Meaningful Benefits of the HCV Program

Liberty Resources, Inc. claims that the Philadelphia Housing Authority has violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, Section 202 of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, and their implementing regulations, by failing to make its Housing Choice Voucher Program accessible to people with mobility disabilities.

Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance". 29 U.S.C. § 794(a) (Section 504 of the RA). The RA was "the first federal statute to provide broad prohibitions against discrimination on the basis of disability." *Yeskey v. Pennsylvania Dep't of Corrections*, 118 F.3d 168, 170 (3d Cir.1997).

■ Because the RA applies only to federally funded programs and activities, Congress enacted Title II of the ADA to extend these prohibitions to all state and local government programs and activities. *Id.* As a result, Title II of the ADA closely resembles the language of Section 504 of the ADA and states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (Section 202 of the ADA, Title II). Given their similar language and related purposes, Congress has directed that Title II of the ADA and Section 504 of the RA be construed and applied consistently. *Yeskey* at 170. As a result, leading cases, including those in the Third Circuit, have addressed these statutes *in pari materia.*[17] *Id.*

17. Both Title II and Section 504 have implementing regulations. While some of these regulations are given controlling weight in a court's determination of disability discrimination, others may only provide a court with guidance.

The Department of Justice (DOJ) has regulations designed to implement Title II of the ADA and Section 504 of the RA. These regulations outline the programs and resources that should be provided to disabled people. Congress authorized the creation of DOJ regulations to implement both Title II and Section 504. *Id.* at 171. The DOJ regulations are given controlling weight, "[u]nless the regulations are 'arbitrary, capricious or manifestly contrary to the statute.'" *Helen L. v. DiDario*, 46 F.3d 325, 332 (3d Cir.1995) (quoting *Chevron, U.S.A., Inc. v. Natural Res. Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); *Yeskey* at 171.

Additionally, HUD has regulations that implement Section 504. Unlike the DOJ regulations, the HUD regulations created to implement Section 504 are legally unenforceable because they do not confer a private right of action. Rather than fleshing out the personal rights created by statute, the regulations that HUD "seek[s] to enforce relate to 'institutional policy and practice, not individual instances' of discrimination.'" *Three Rivers Center for Independent Living v. Housing Authority of City of Pittsburgh*, 382 F.3d 412, 429 (3d Cir.2004) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 288, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002)). "Thus the Housing Authority can fail to comply with the regulations and still not deny access to a disabled individual." *Id.* at 430. Although HUD regulations are not legally enforceable, they may assist a court in determining whether a defendant is liable under Section 504. *See Id.* at 431.

When analyzing whether a violation of either Title II or Section 504 has occurred, the first step a court must take in a disability discrimination case is to determine if there is a prima facie showing of discrimination. In order to establish a prima facie showing of disability discrimination under the RA, the plaintiff bears the burden of proving that 1) he or she is a "handicapped individual," 2) he or she is "otherwise qualified" for participation in the program, 3) the program receives "federal financial assistance," and 4) he or she was "denied the benefits of" or "subject to discrimination" under the program. *Nathanson v. Medical College of Pennsylvania*, 926 F.2d 1368, 1380 (3d Cir.1991) (quoting *Strathie v. Department of Transp.*, 716 F.2d 227, 230 (3d Cir.1983)). Similarly, under Title II of the ADA a plaintiff must establish that 1) he or she has a disability; 2) he or she is otherwise qualified; and 3) he or she is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely because of her disability. *Jones v. City of Monroe*, 341 F.3d 474, 477 (6th Cir.2003); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir.2003).

Once a plaintiff establishes a prima facie showing of discrimination, he or she has the burden of articulating reasonable accommodations that the defendant can make in order to comply with the ADA and the RA. *See Frederick L. v. Department of Public Welfare of Com. of Pennsylvania*, 364 F.3d 487, 492 n. 4 (3d Cir.2004) (construing *Olmstead v. L.C.*, 527 U.S. 581, 587, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999)). The burden then shifts to the defendant to make any reasonable accommodations, unless the defendant can prove that the accommodations would be unduly burdensome or fundamentally alter the program. *See Frederick L.* at 487, 492 n. 4; *Nathanson* at 1384;

Thus, only after a plaintiff has established a prima facie case of disability discrimination must the court undertake a reasonable accommodation analysis. If a plaintiff cannot establish a prima facie case of discrimination there is no violation of either the ADA or the RA and no accommodations are necessary.

In this case, the parties do not dispute that LRI represents handicapped individuals who are otherwise qualified for the HCV Program. Additionally, both parties recognize that HCVP receives federal financial assistance. Hence, the only debated element required for LRI to prove a prima facie case of discrimination is whether the mobility disabled people LRI represents were discriminated against under HCVP or denied benefits of the program. Plaintiffs do not assert that the HCV Program directly discriminates against mobility disabled people. Rather, the key is whether Plaintiff has been denied meaningful access to HCVP's benefits.

In *Alexander v. Choate*, 469 U.S. 287, 301, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), the Supreme Court held that compliance with Section 504 "requires that an otherwise qualified handicapped individual be provided with meaningful access to the benefit that the grantee offers." The central issue in *Alexander* was Tennessee's reduction in the number of inpatient treatment days covered by its Medicaid program from 20 to 14 days per year. 469 U.S. at 289, 105 S.Ct. 712. Disabled Medicaid participants claimed that this reduction violated Section 504 of the RA because a greater percent of program participants were disabled who required a stay longer than 14 days. *Alexander*, 469 U.S. at 290, 105 S.Ct. 712. Based on disabled participants' need for longer inpatient care, the plaintiffs argued they were denied meaningful access to the Medicaid program. *Id.* The Court viewed the argument that

"to provide meaningful access to Medicaid Services, Tennessee must single out the handicapped for *more* than 14 days of coverage" as "simply unsound." *Id.* at 302–03, 105 S.Ct. 712. The Court stated that:

such a suggestion must rest on the notion that the benefit provided through State Medicaid programs is the amorphous objective of 'adequate health care.' But Medicaid programs do not guarantee that each recipient will receive that level of health care precisely tailored to his or her particular needs. Instead, the benefit provided through Medicaid is a particular package of health care services. That package of services has the general aim of assuring that individuals will receive necessary medical care, but the benefit provided remains individual services offered-not 'adequate health care.'

*Id.* at 303, 105 S.Ct. 712. The Court noted that the reduction in inpatient care applied to both handicapped and non-handicapped individuals. *Id.* at 302, 105 S.Ct. 712. As a result, the Court held that plaintiffs were not denied meaningful access to a program benefit because the benefit offered was an inpatient stay of 14 days or fewer. *Id.* "Section 504 does not require the State to alter this definition of benefit being offered simply to meet the reality that the handicapped have greater medical needs." *Id.* at 303, 105 S.Ct. 712. The Court concluded that although the RA "seeks to assure even handed treatment and the opportunity for handicapped individuals to participate in and benefit from programs receiving federal assistance[,][t]he Act does not ... guarantee the handicapped equal results ...." *Id.* at *See also Kruelle v. New Castle County Sch. Dist.*, 642 F.2d 687, 695 (3d Cir.1981) (stating that the RA "does not require more than evenhanded treatment of handicapped and nonhandicapped by state agencies.").

Additionally, the Court rejected the argument that Medicaid's durational limitation on inpatient coverage violated Section 504. *Id.* at 306, 105 S.Ct. 712. The Court held that there was no indication that Congress intended with the passage of Section 504 to eliminate the States' discretion in selecting the benefits offered in their Medicaid program. *Id.* at 307, 105 S.Ct. 712. As the Court expressed, "[b]efore we would find these generally worded regulations were intended to limit a State's longstanding discretion to set otherwise reasonable Medicaid coverage rules, that intent would have to be indicated with greater specificity ...." *Id.*

Since the Court's ruling in *Alexander*, few courts have explored how to define meaningful access or determine when a program provides or denies disabled people meaningful access to its benefit. Two cases explored this issue and held that there was no denial of meaningful access to benefits. *Rodriguez*, 197 F.3d 611; *Safe Air for Everyone v. Idaho*, 469 F.Supp.2d 884 (D.Idaho 2006).

In *Rodriguez*, the plaintiffs were mentally disabled Medicaid recipients who claimed that New York's Medicaid program violated the ADA and the RA because it did not include safety monitoring in its personal-care services and hence denied the plaintiffs' meaningful access to the program's benefits. *Rodriguez*, 197 F.3d at 618. The Second Circuit found that safety monitoring was not offered to anyone and therefore New York had not violated the ADA or the RA because no one received this benefit. *Id.* The Second Circuit affirmed that the ADA and the RA do not "mandate the provision of new benefits." *Id.* at 619. Furthermore, it noted that under the ADA and the RA, it is not the responsibility of the courts to determine what benefits New York must provide to Medicaid Recipients. *Id.*

Additionally, in *Safe Air*, a court also concluded there was no denial of meaning-

ful access to benefits. 469 F.Supp.2d 884. In *Safe Air*, the plaintiff alleged that Idaho violated the ADA and RA in its implementation of its Smoke Management Program (SMP), which regulated field burning in Idaho. *Safe Air*, 469 F.Supp.2d at 888. The plaintiff, Safe Air for Everyone (SAFE), a private foundation, argued that its constituents were denied the benefits of the program, such as "access to the outdoors, public parks, streets, and the like as a result of the State's failure to accommodate their disabilities when implementing and administering the Smoke Management Program." *Id.* The Idaho District Court found that access to the outdoors, public parks, etc. were not benefits of the SMP and that both disabled and non-disabled citizens received the same benefits from SMP. *Id.* Furthermore, the court noted that the State could not provide the benefits requested by SAFE, i.e. access to the outdoors, because the alleged benefits denied to the plaintiff were the result of smoke produced by private individuals. *Id.* at 889. As explained by the court, "this is not a case where a state requirement places a greater burden upon disabled individuals. Instead the challenge here is to a regulatory scheme which controls the actions of private individuals." *Id.* In light of these findings, the District Court of Idaho held that the State had not violated the ADA or RA because there was no denial of meaningful access to benefits. *Id.*

 These opinions do not precisely define "meaningful access to benefits," however they do reflect the message communicated in *Alexander* that the statutory mandates of the RA and ADA only require a program to provide equal access to its core services. If a program provides these core services in a non-discriminatory manner then it has provided meaningful access to its benefits and an expansion of those services is not required by statute or regulation. *See Olmstead*, 527 U.S. at 603 n. 14,

119 S.Ct. 2176 ("We do not in this opinion hold that the ADA ... requires States to 'provide a certain level of benefits to individuals with disabilities.' We do hold, however, that States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide") (internal citations omitted); *Rodriguez*, 197 F.3d at 618 ("The ADA requires only that a particular service provided to some not be denied to disabled people."); *Safe Air for Everyone v. Idaho*, 469 F.Supp.2d at 889–90 ("meaningful access does not require that the disabled receive a greater benefit but, instead, that the handicapped are provided equal access to the benefit offered by the state as provided to non-handicapped individuals.").

According to the statute authorizing Section 8 and the HCV Program, the program was created "[f]or the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing ...." 42 U.S.C. § 1437f(a). A HUD regulation designed to implement Section 8 states that the purpose of the HCV Program is: "HUD pays rental subsidies so eligible families can afford decent, safe and sanitary housing." 24 C.F.R. § 982.1(a)(1) ("Part 982 is a unified statement of program requirements for the tenant-based housing assistance programs under Section 8 of the United States Housing Act of 1937 (42 U.S.C. 1437f)"). Neither the Statute nor the HUD regulation promise to provide housing to all eligible participants. Rather, they state that the purpose of HCVP is to aid families in locating and affording decent housing through the provision of rental subsidies. The HCV Program facilitates the placement of low-income families in affordable housing by seeking the assistance of private sector landlords.

Relying on the Section 8 authorizing statute and the HUD implementing regu-

lations, LRI claims that the benefit HCVP provides is safe, sanitary, and affordable housing. Based on this definition of the benefit provided by HCVP, LRI contends that because there are not enough mobility disabled accessible units available in the private rental market, its constituents have been denied meaningful access to the benefits of the HCV Program. However, LRI mistakenly asserts that the benefit of HCVP is affordable housing.

▮ Similar to *Alexander*, in which the plaintiff sought to define the benefit offered by Medicaid as "adequate health care," LRI defines the benefit offered by the HCV Program as affordable housing. In *Alexander*, the Court found that this definition of the benefit provided by Medicaid was amorphous and inaccurate. 469 U.S. at 303, 105 S.Ct. 712. The Court refused to adopt the plaintiffs' definition of the benefit and instead held that the benefit provided was, in reality, a more modest package of health care services, which had the general goal to provide adequate health care. LRI is correct to assert that HCVP offers more than just a funding conduit for vouchers, but it errs by misconstruing the benefit of HCVP as the provision of affordable housing.

The benefits of the HCV Program are a package of services that provide assistance to voucher holders in locating affordable housing. These benefits include: inspection of premises for compliance with quality standards, training for landlords, a service representative who may be contacted for questions, weekly landlord briefings to educate landlords interested in participating in HCVP, a list of known available units, monthly housing fairs, and various other services.

HCVP does not offer participants a place to live as a benefit.[18] HCVP is not responsible for locating participant housing. Rather, the onus is on program participants to find their own rental units. *See* 24 C.F.R. § 982.302 ("PHA issues a voucher to a family. The family may search for a unit. [ ] If the family finds a unit, and the owner is willing to lease the unit under the program, the family may request PHA approval of tenancy.").

▮ As held in *Alexander* and reiterated in *Rodriguez* and *Safe Air*, a violation of the ADA or RA only occurs when a disabled person is denied meaningful access to a benefit already provided by the program. The record shows that mobility disabled voucher holders have successfully accessed the variety of services that PHA does offer under the HCV Program. They have secured vouchers, received voucher term extensions, received and used Availability Listings, attended meetings and housing fairs at PHA, had units that they intend to rent inspected for quality standards, and had access to PHA service representatives trained to address mobility and accessibility issues. Furthermore, undisputed facts also show that PHA has made efforts beyond the standard package of services offered to all voucher holders.

In 2004, PHA conducted a modest landlord outreach campaign that included letters to all HCVP-participating landlords informing them about accessibility modifications, made presentations to landlords detailing accessibility modification opportunities, and conducted a telephone survey to determine whether certain apartment complexes had accessible units. To assist mobility-disabled voucher holder, PHA has

18. Both LRI and PHA refer to "HCVP housing" throughout their briefs. This term is misleading because it suggests that PHA has ownership of or control over the units that HCVP voucher holders rent. Some private landlords are known for renting or being willing to rent to voucher holders, and thus they are listed on the Availability List distributed by PHA to voucher holders.

also signed a memorandum of understanding with an organization that specializes in housing disabled people.

A plain reading of HUD regulations governing Section 8 programs shows that funding modifications to privately-owned units is not a service offered by HCV Programs. To the contrary, the regulations reflect an expectation by HUD that HCVP participants will select units that already meet individual needs and quality standards based on their existing state. *See* 24 C.F.R. § 982.1(a)(2) ("Families select and rent units that meet program housing quality standards."); 24 C.F.R. § 982.1(b)(2) ("to receive tenant-based assistance, the family selects a suitable unit."). LRI contends that in order to comply with the ADA and RA, PHA must change the services offered under HCVP to provide such things as funding for accessibility modifications, individualized search assistance, and across-the-board higher rents for accessible units. However, these are not benefits currently offered under the HCVP nor suggested by HUD regulations.

HUD regulations also do not indicate that individualized housing search assistance or across-the-board higher rents for certain persons are intended to be part of the package of services offered by Section 8 Programs. The regulations generally put the onus of locating an available unit in the marketplace wholly on the voucher holder. *See* 24 C.F.R. § 982.302 ("PHA issues a voucher to the family. The family may search for a unit."); 24 C.F.R. § 982.1(b) (1) ("With tenant-based assistance, the assisted unit is selected by the family.").

As to increased rental subsidies, the regulations only describe a process of requesting exception rents on a case-by-case basis, and contingent upon both HUD approval and necessity. *See* 24 C.F.R. § 982.503(c)(2)(ii) ("The HUD Field Office may approve an exception payment standard amount within the upper range if required as a reasonable accommodation for a family that includes a person with disabilities."); HUD Notice PIH 2006–13(HA) at 4 (Mar. 8, 2006) ("Requests for exception rents above 120% that are needed as a reasonable accommodation to a person with a disability to allow the person to rent an appropriate unit must be submitted to HUD headquarters for regulatory waiver and approval.").

LRI seeks these changes to the HCV Program in an effort to increase the availability of housing for the mobility disabled. The crux of LRI's claim rests on the fact that mobility disabled people are unable to locate and obtain accessible housing units because there are so few available on the market. LRI contends that this is the result of PHA's failure to provide meaningful access to program benefits. However, PHA provides even handed treatment to mobility disabled applicants and does not deny them access to any benefits of the program. While it is true that mobility disabled program participants have not seen equal results, as held in *Alexander*, if a program provides even handed treatment it does not violate the ADA or RA for failure to provide equal results. Furthermore, in this case, it is difficult to imagine that equal results are attainable since, as was the case in *Safe Air*, the plaintiff is asking PHA, the public entity responsible for HCVP to resolve a difficulty experienced by disabled people that is the result of the actions of private individuals.[19]

---

19. In *Safe Air* the private action the plaintiff wished to curtail was field burning. In this case, the private action LRI wishes to alter is the failure of the private housing sector to make a sufficient number of accessible units available to the HCV Program.

While this case is similar to *Alexander* in that both plaintiffs seek an expansion of services beyond those currently offered., it provides an even more compelling reason to hold that there is no violation of the ADA or RA. In *Alexander* the plaintiff alleged that if Medicaid changed its policy to cover twenty days of inpatient treatment, the discrimination would cease to exist. Unlike *Alexander*, LRI does not contend that any change to the HCV Program would automatically end the alleged discrimination. This is because LRI's problem with HCVP is its failure to provide enough accessible housing. But, HCVP does not provide housing to program recipients. Rather, it assists program participants in finding their own housing in the private market.

LRI has failed to present that the changes it seeks to the HCV Program will increase the availability of accessible units in the private market. It is entirely possible that even if HCVP accomplished all of the requested changes there still might not be enough accessible units available for the mobility disabled. PHA is not responsible and cannot control the actions of private landlords. As a result, PHA cannot be held to violate the ADA and RA for the failure of the private rental market to provide voucher holders with a sufficient number of accessible units.

Lastly, as argued in *Alexander* in regard to the State Medicaid plan, PHA has broad discretion to determine the services it offers under the HCV Program and Congress has not indicated any intent to remove that decision making power from PHA. Therefore, as reasoned in *Rodriguez*, it is not the place of this Court to determine the benefits that PHA should provide under HCVP.

For the foregoing reasons, PHA has violated neither the RA nor the ADA.

## V. CONCLUSION

PHA is entitled to summary judgment because LRI has failed to establish a prima facie case of disability discrimination. The record reflects that Plaintiff has failed to establish the final prong of a prima facie case of discrimination. This is because mobility disabled participants in HCVP have neither been discriminated against nor been denied meaningful access to the benefits of the HCV Program. LRI correctly asserts that PHA could enact many of its suggested program revisions. However, the RA and ADA do not compel PHA to enlarge the scope of its HCV Program. While there is definitely more that could be done to assist mobility disabled HCVP participants, it is not the role of this Court to implement these changes.

## ORDER

**AND NOW**, this *17TH* day of December, 2007, it is **ORDERED** that Defendant's Cross–Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment as to Liability (Doc. # 105) is **GRANTED** and Plaintiff's Motion for Summary Judgment as to Liability (Doc. # 92) is **DENIED**.

It is further **ORDERED** that judgment is entered in favor of Defendant and this action is **DISMISSED**.